(Post. 11/19/19)

# CIVIL DRAW SHEET

**Date Filed:** May 25, 2021                    **Docket Clerk:** BD

**Case Number:** 3:21-cv-104

**District Judge:** Kristine G. Baker          **Magistrate Judge:** Joe J. Volpe

**Case Style:** Coy's Honey Farm, Inc. v. Bayer Corporation, et al

**Division:** Northern

## District Judge drawn from Assignment Deck

- ☑ Civil
- ☐ Discrimination and Title VII
- ☐ Social Security
- ☐ Prisoner
- ☐ Bankruptcy
- ☐ Pine Bluff Death Penalty
- ☐ Miscellaneous Case Matters

## Magistrate Judge drawn from Assignment Deck

- ☑ Magistrate Case Matters
- ☐ Magistrate Social Security Referral
- ☐ Magistrate Prisoner 1983 & 550
- ☐ Magistrate Prisoner Habeas

**Summons Issued:** ☑ Yes ☐ No

If yes, Names of Defendants: all

**Notice of Right to Consent provided:** ☑ Yes ☐ No

```
Court Name: EASTERN DISTRICT OF ARKANSAS
Division: 4
Receipt Number: LIT002243
Cashier ID: bodunl
Transaction Date: 05/25/2021
Payer Name: RICHARD KAYS LAW FIRM

CIVIL FILING FEE- NON-PRISONER
 For: RICHARD KAYS LAW FIRM
 Case/Party: D-ARE-3-21-CV-G00104-001
 Amount:       $402.00
--------------------------------------
CREDIT CARD
 Amt Tendered:  $402.00
--------------------------------------
Total Due:      $402.00
Total Tendered: $402.00
Change Amt:     $0.00


"Only when bank clears the check,
money order, or verifies credit of
funds is the fee or debt officially
paid or discharged.  A $53 fee will
be charged for a returned check."
```

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

3:21-CV-104-KGB

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

COY'S HONEY FARM, INC.

**DEFENDANTS**

BAYER CORPORATION, ET AL

**(b)** County of Residence of First Listed Plaintiff   CRAIGHEAD
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   ELKHART
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Richard H. Mays, Richard Mays Law Firm PLLC, 2226 Cottondale LN#100, Little Rock,AR72202(501-891-6116)

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [ ] 2  U.S. Government Defendant
- [ ] 3  Federal Question *(U.S. Government Not a Party)*
- [x] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [x] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [x] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | **PERSONAL INJURY** | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 365 Personal Injury - Product Liability | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 320 Assault, Libel & Slander | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 330 Federal Employers' Liability | [ ] 368 Asbestos Personal Injury Product Liability | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| | [ ] 340 Marine | | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | **LABOR** | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards Act | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 720 Labor/Management Relations | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | [ ] 362 Personal Injury - Medical Malpractice | [x] 385 Property Damage Product Liability | [ ] 740 Railway Labor Act | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 751 Family and Medical Leave Act | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | [ ] 790 Other Labor Litigation | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | [ ] 791 Employee Retirement Income Security Act | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | **FEDERAL TAX SUITS** | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 871 IRS—Third Party 26 USC 7609 | |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | | |
| | | [ ] 550 Civil Rights | **IMMIGRATION** | |
| | | [ ] 555 Prison Condition | [ ] 462 Naturalization Application | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | [ ] 465 Other Immigration Actions | |

**SOCIAL SECURITY**
[ ] 861 HIA (1395ff)
[ ] 862 Black Lung (923)
[ ] 863 DIWC/DIWW (405(g))
[ ] 864 SSID Title XVI
[ ] 865 RSI (405(g))

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1  Original Proceeding
- [ ] 2  Removed from State Court
- [ ] 3  Remanded from Appellate Court
- [ ] 4  Reinstated or Reopened
- [ ] 5  Transferred from Another District *(specify)*
- [ ] 6  Multidistrict Litigation - Transfer
- [ ] 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 USC Sec. 1125(a) ; Ark. Code Ann. Sec. 16-226-101, et seq.

Brief description of cause:
Damage to Property Due to Defective Product

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
$75,000+

CHECK YES only if demanded in complaint:
JURY DEMAND:    [x] Yes    [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*

JUDGE _____    DOCKET NUMBER _____

DATE   May 25 2021

SIGNATURE OF ATTORNEY OF RECORD   *Richard H. Mays*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____



**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION**

FILED
U. S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAY 2̶5 2021

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

**COY'S HONEY FARM, INC.**                          **PLAINTIFF**

**VS.**                    No. 3:21-CV-104-KGB

**BAYER CORPORATION;**          This case assigned to District Judge _Baker_
**BAYER U.S., LLC;**            and to Magistrate Judge _Volpe_
**BAYER CROPSCIENCE (ARKANSAS) INC.;**
**BASF CORPORATION; and**
**BASF AGRICULTURAL SOLUTIONS SEED US LLC**          **DEFENDANTS**

## COMPLAINT

Comes the Plaintiff, Coy's Honey Farm, Inc., and for its cause of action against the Defendants, Bayer Corporation; Bayer U.S., LLC; Bayer Cropscience (Arkansas) Inc.; BASF Corporation; BASF SE; BASF Crop Protection, and BASF Agricultural Solutions Seed US LLC (collectively "BASF"); and states:

### *The Parties*

1.     Plaintiff is a corporation organized and existing under the laws of the State of Arkansas, with its principal office in Craighead County, Arkansas. Plaintiff's principal business is the commercial keeping, reproduction and use of honey bees, and the harvesting, marketing and sale of honey produced by those bees.

1

2. Defendant, Bayer Corporation, is a foreign for-profit corporation authorized to do business in the State of Arkansas, whose principal address is 1884 Miles Avenue, Elkhart, Indiana 46515-0040, and whose agent for service in the State of Arkansas is Corporation Service Company, 300 Spring Building – Suite 900, 300 South Spring Street, Little Rock, Arkansas 72201.

3. Defendant, Bayer U.S. LLC, is a Delaware foreign limited liability company authorized to do business in the State of Arkansas, whose principal address is 100 Bayer Road, Pittsburgh, PA 15206, and whose agent for service in the State of Arkansas is Corporation Service Company, 300 Spring Building – Suite 900, 300 South Spring Street, Little Rock, Arkansas 72201.

4. Defendant, Bayer Cropscience (Arkansas) Inc., is a New York for-profit corporation authorized to do business in the State of Arkansas, whose address is 2 T.W. Alexander Drive, Durham, N.C. 27709, and whose agent for service in the State of Arkansas is Corporation Service Company, 300 Spring Building – Suite 900, 300 South Spring Street, Little Rock, Arkansas 72201.

5. Defendant, BASF Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 100 Park Avenue, Florham Park, New Jersey, and whose agent for service in the State of Arkansas is CT Corporation System, 124 West Capitol Avenue – Suite 1900, Little Rock, Arkansas 72201.

6.  Defendant, BASF Agricultural Solutions Seed US LLC, is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business at 100 Park Avenue, Florham Park, New Jersey, and whose agent for service in the State of Arkansas is CT Corporation System, 124 West Capitol Avenue – Suite 1900, Little Rock, Arkansas 72201.

## JURISDICTION AND VENUE

7.  This Court has subject matter jurisdiction of this case pursuant to 28 U.S.C. §§1331 and 1332, and supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

8.  Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2), in that this is the judicial district in which a substantial part of the events or omissions giving rise to the Plaintiff's claim occurred, and a substantial part of the property that is the subject of this litigation is situated.

### *Nature of Case*

9.  This is a case involving the effects of herbicides containing the chemical Dicamba ("the Dicamba Herbicides" or simply "Dicamba") developed, manufactured, marketed and sold by each of the Defendants in the State of Arkansas and applied by spraying on row crops, such as soybeans, cotton and corn, in thousands of acres throughout east Arkansas.

3

10. Dicamba is a selective benzoic acid herbicide used to control a wide spectrum of broadleaf weeds. It has a broad application window and can be used as a burn-down, pre- and post-emergence residual herbicide. Dicamba is rapidly absorbed by plant leaves, stems, and roots, and works [as an auxin agonist] by mimicking naturally-occurring plant hormones (*i.e.*, auxins) that regulate many plant processes, such as protein synthesis and cell growth. Dicamba induces rapid abnormal cell growth and development in the stems, petioles, and leaves of sensitive plants, and also limits transpiration and photosynthesis, leading to irregular cell growth, leaf drop, and starvation, resulting in plant death.

11. Within the short span of five years, the United States and other major agricultural nations have seen a dramatic increase in the use of Dicamba Herbicides as a means of controlling weeds, such as Palmer amaranth (Pigweed) in soybean, corn and cotton fields that have developed a tolerance for other herbicides. Giant international chemical companies such as Monsanto (acquired by Defendant Bayer in 2018) and BASF have developed seeds for soybean, corn and cotton that are genetically-modified to withstand Dicamba, and those companies sell the seeds and the Dicamba Herbicides to farmers as a "system."

12. While it may be a clever scheme, it is one that is extremely dangerous to other parts of the environment. Besides being efficient at killing weeds, Dicamba has other characteristics that make its use highly risky:

4

      a.     All of the Dicamba Herbicides that are sprayed over the top of the genetically modified plants settle on the plants and soils that are its target. Instead, portions of it "drift" (move with wind/breezes in the air) to other fields and areas off the target site, resulting in damage to or death of non-genetically-altered crops, domestic and wild plants, bushes, and trees that are sensitive to and damaged or eradicated by the Dicamba Herbicides that drift onto them.

      b.     The Dicamba Herbicides are also subject to "volatilization," which means it converts from the liquid phase in which it is applied when sprayed on the genetically-modified plants to a gaseous form after the spraying. That conversion from liquid to gas can occur hours to days after the Dicamba Herbicide is sprayed over the plants. Furthermore, the amount of Dicamba Herbicide that volatilizes increases with temperature; *i.e.*, the higher the ambient air temperature, the greater the amount of volatilization of the Dicamba Herbicides.

13.    The areas that may be affected off the target fields by "drift" or "volatilization" of the Herbicides (also referred to as "chemical trespass") may be substantial distances from the fields on which they were originally applied. Further, because of such volatilization, it is difficult, if not impossible, to trace the

specific field that was the source of the original application of the Dicamba Herbicide.

14.  The herbicides manufactured and sold by the Defendants that contain Dicamba that are currently used by many Arkansas farmers, are marketed under various trade-names, including, without limitation, XtendMax® Herbicide with VaporGrip® Technology ("XtendMax") (by Bayer), and Engenia® (by BASF).

15.    Beginning in 2017, the use of this dicamba system resulted in an explosion of claims filed with the Arkansas Plant Board by crop growers who had not converted to Monsanto or BASF's Dicamba Herbicide system, and from other owners of property to where the Dicamba drifted or volatilized, causing death or damage to fruit or nut trees, vegetable farms and gardens, ornamental plants and natural vegetation. As the acreage on which Dicamba-tolerant crop seeds are planted increases, the quantity of Dicamba Herbicide that is applied to those fields increases each year, causing greater quantities and concentrations of Dicamba drift and volatilization, and more widespread and extensive collateral damage. This also has the effect of driving farmers who have not used the Defendants' Dicamba-tolerant seeds and herbicides to switch to that "system" as a defense to protect against loss of non-dicamba tolerant crops.

16.    The magnitude of this problem in Arkansas alone becomes evident when one considers that in 2020, there were approximately 2.8 million acres in the

State planted in soybeans, 1.3 million acres in rice, and 300,000 acres of corn. (Ark. Farm Bureau). Monsanto claims that its Dicamba system was used on 1.5 million acres of soybeans in Arkansas, most of which acreage is in east Arkansas. Nationally, the U.S. EPA states that, in 2018, approximately 41 percent of the nation's soybeans and 70 percent of the cotton acreage was planted with Dicamba-tolerant seed. These numbers will grow as farmers who have not used Dicamba genetically-modified seeds and herbicides will begin to do so as a defensive measure to avoid having their plants killed by drift or volatilization from their neighbor's Dicamba fields.

17.     The inevitable result will be millions of acres of fields with genetically-modified crops surrounded by a landscape of dead or damaged crops, bushes and trees, devoid of flowering plants, with the resulting loss of birds, bees and other foraging animals and insects who need those plants for their sustenance.

### Coy's Honey Farm

18.  The Plaintiff, Coy's Honey Farm Inc. ("Coy's) was incorporated in the State of Arkansas in 1997. It is a small, closely-held corporation whose shareholders consist of members of the Coy family. It was initially founded by Bobby E. Coy, who commenced bee-keeping and honey-producing operations with approximately 20 hives in the Jonesboro, Arkansas, area, and who was

7

subsequently joined in the business by his wife, Anna Coy, and his two sons,

Richard D. Coy and David Coy. Bobby Coy is the President of Coy's; Anna Coy is

the Secretary; and Richard and David Coy are Vice-Presidents of the company.

19.  Through the years subsequent to its formation in 1997, Coy's Honey

Farm, Inc. has grown significantly.   In 2017, the number of bee hives owned and

operated by Coy's had grown to approximately 13,000. Each hive contains

between 20,000 and 50,000 bees.

20.  The hives containing the bees are frequently placed, with the permission

of landowners and authority of the Arkansas State Plant Board, in areas between or

near fields of crops, including soybeans, cotton and corn grown in eastern

Arkansas. The bees are useful to the crops during the growing season through

assisting in pollination of the crops. The bees also obtain pollen and nectar from

those crop plants and other domestic plants and flowers grown in gardens and

yards in the vicinities where the hives are placed, and from wildflowers. The bees

transport the pollen and nectar from the crops and plants to their hives and produce

honey in the hives on which they feed, and a portion of which Plaintiff harvests

and sells as part of its business operations.

21.  In 2017 and 2018, Plaintiff had approximately 260 locations for its hives

in various parts of Craighead, Crittenden, Cross, Mississippi, Poinsett, Clay,

Jackson, Greene, Lee, Phillips, Woodruff, Monroe, St. Francis and White Counties

8

in Arkansas. Many of those locations were in undeveloped areas between fields in which were and are grown corn, soybeans and cotton, from which the bees would obtain nectar and pollen, as well as from natural and ornamental plants in the undeveloped areas and nearby yards and gardens.

22. Bees are critical to our environment and to our food supply. As they collect nectar for their hives, bees travel from plant to plant spreading pollen that collects on their legs and bodies. Aside from the many benefits of having bees in gardens, bees pollinate 85 percent of food crops intended for human consumption. Further, bees are the only insect that produce a food (honey) consumed by humans. Honey provides numerous vitamins, minerals and antioxidants to our diets. Most notably, honey contains adequate levels of vitamins B1, B3 and B6, as well as minerals like calcium, iron, potassium and zinc. In addition to its use as a healthy alternative to sugar in baked goods and cooking, honey has powerful antibacterial properties. It kills bacteria and prevents infection in skin wounds, and has been shown to relieve allergies due to trace amounts of pollen.

23. The honey produced by the Plaintiff's bees is generated from pollen and nectar collected by the bees from wild and domestic flowers, blooms of crop plants, bushes, fruit trees, flowers, wild trees and other natural vegetation, and taken by the bees to hives owned by the Plaintiff, where the bees produce the honey.

9

24.    However, with the development of the new Dicamba Herbicides named above, the pollen and nectar sources for Plaintiff's bees has been greatly diminished as a result of the drift, volatilization and other spread of the Dicamba Herbicides from the fields and crops on which they were applied to the non-field areas on which the herbicides were not intended or allowed to be applied, thereby damaging or eradicating the plants in those areas.

25.  As a result of the damage to or eradication of the plants from which the Plaintiff's bees acquired their nectar and pollen, and the resulting reduction in the production of honey by the bees, Plaintiff has sustained loss of sales and income from the sale of honey.  Plaintiff has also sustained the loss of bees through the effects of the Dicamba Herbicides on the bees in the reduction in their food supply necessary to support their lives.

26.  In the Fall of 2016, Defendants received regulatory approval from the U.S. Environmental Protection Agency (U.S. EPA) to market the herbicides trade-named XtendiMax (manufactured by Bayer and its predecessor, Monsanto), Engenia (manufactured by BASF), and FeXapan (manufactured by Corteva and its predecessor, DuPont), subject to certain restrictions on the manner in which these Dicamba-based herbicides could be used. Those restrictions were imposed because of concerns about the well-known potential for the drift and volatilization of Dicamba Herbicides when released over crops in the field, and were intended to

prevent or minimize unintended spread through drift or volatilization of the herbicides from the target areas to other fields and property in the area of application. The EPA registration for Dicamba Herbicides was renewed in 2018.

27. In the process of obtaining regulatory approval for the herbicides, the Defendants represented to the EPA that the potential of the herbicides to drift or volatilize when applied in a target area was minimal. However, the Defendants would not permit any testing of the herbicides for the characteristics of drift or volatilization to be conducted by university agricultural departments or state agencies. Such testing of new or proposed herbicides by university agricultural experts prior to their introduction, is traditional and customary .

28. Before and after the registration of the Dicamba Herbicides by EPA in the Fall of 2016, the Defendants also represented in its marketing of the herbicides to farmers and other users of the herbicides, that the potential of the herbicides to drift or volatilize when applied to a target area was minimal.

29. Defendants were warned by numerous weed scientists that the Dicamba Herbicides would drift and volatilize. Those weed scientists include but were not limited to Jason Norsworthy, Ph.D. of the University of Arkansas Department of Agriculture, and Ford Baldwin, Ph.D., who was formerly the University of Arkansas Extension Weed Scientist from 1974 to 2001 and is currently a professional agricultural crop consultant. They have published and continue to

11

publish results of their research and investigations into the effects of Dicamba

Herbicides on row crops and other plant life in Arkansas, and continue to be of the

opinion that the Dicamba Herbicides are extremely detrimental to non-Dicamba

tolerant soybeans, cotton and corn and other vegetation, and that their ability to

drift and volatilize cannot be controlled.

30.  Scientific opinions and reports of reputable weed scientists in academia

and professional consulting services, within and outside the State of Arkansas, are

virtually unanimous in their opinion that dicamba herbicides are extremely

difficult, if not impossible, for applicators to control, and that through drift,

volatilization and other migration off-target, they are causing and will continue to

cause widespread damage. A few of those scientists are:

> **Jason K. Norsworthy, Ph.D.**, a member of the University of
> Arkansas Agricultural Service, where he is a Distinguished Professor;
> and a fellow of the Weed Science Society of America (WSSA).  Dr.
> Norsworthy is considered to be an expert on the subject of the
> characteristics of dicamba herbicides, and their effect, not only on
> crops but also "non-target" plants.

> Dr. Norsworthy concluded, among other things, that "secondary
> movement" is considered by academics across multiple states to be "a
> major concern with off-target movement of dicamba, *and is not
> manageable by the applicator.*"

> **Ford Baldwin, Ph.D**. Dr. Baldwin was the University of Arkansas
> Extension Weed Scientist for 28 years, and a Fellow of the Weed
> Science Society of America since 1996. Since 2001 he has worked as
> a private agricultural consultant with Practical Weed Consultants,
> LLC.

Dr. Baldwin's opinion regarding the use of dicamba is summarized as: "Dicamba has a chemistry problem that likely cannot be fixed, or at least no evidence has been provided that it can be successfully applied. ... [I]gnoring the significant scientific data regarding the off target movement of dicamba will be the biggest environmental disaster agriculture has ever seen."

***Trey Koger, Ph.D.*** is a Research Agronomist with and owner of Delta Crop and Research, Inc. in Indianola, Mississippi, and also farms. In 2018, he was commissioned by the Arkansas Plant Board to conduct an independent investigation regarding the impacts of dicamba herbicides on non-crop species in Arkansas.

Dr. Koger's reports to the Plant Board contained statements such as:

> *Dicamba-like symptomology was prevalent in every city, town and community I visited. ...* Significant injury was documents to the following tree species: cherry, white oak, sycamore, maple, cypress, Bradford pear. *Injury was also documented on virtually every broadleaf vegetable species, including: tomato, squash, okra, cucumbers, watermelons, and cantaloupe. ...* In summary, *dicamba injury was prevalent to sensitive trees, roadside plants, and non-dicamba crops throughout many of the areas in eastern AR in which made [sic] evaluations.*

**Dr. Kevin W. Bradley** is a Professor of Plant Sciences at the University of Missouri, and holds a PhD in Plant Pathology, Physiology, and Weed Science from Virginia Tech University. He is also a Fellow in WSSA, and is highly-regarded in his profession.

Dr. Bradley's views on the propensities of dicamba herbicides to be transmitted to off-target vegetation, and its effect on non-dicamba tolerant broadleaf vegetation are very similar to those of Dr. Norsworthy, Dr. Baldwin and the other scientists discussed herein.

13

**Dr. Thomas C. Mueller and Dr. Lawrence E. Steckel** are both
Professors of Plant Sciences at the University of Tennessee, and
frequently collaborate on research and writing of articles regarding
that research. They are likewise highly-regarded in their professions.
Much of their research has been on the subject of the characteristics of
dicamba herbicides and its impact on off-target vegetation.

Their views on the propensities of dicamba herbicides to be
transmitted to off-target vegetation, and its effect on non-dicamba
tolerant broadleaf vegetation are very similar to those of Dr.
Norsworthy, Dr. Baldwin, Dr. Bradley, and the other scientists
mentioned herein.

31.  The Dicamba Herbicides were highly promoted by the Defendants for

use to commence with the 2017 planting season, and were immediately in demand

with farmers who were having difficulties controlling weeds that had become

resistant to the older herbicides. As a result, since 2017, millions of pounds of

dicamba-containing herbicides have been applied annually to post-emergent

soybeans and cotton in east Arkansas.  The result has been substantial damage to or

loss of non-Dicamba tolerant soybeans and other crops and native plant life in east

Arkansas.

32.  In June 2020, the United States Court of Appeals for the Ninth

Circuit issued a decision in the case of *National Family Farm Coalition et al v.*

*EPA*, 960 F.3d 1120, 1144 (9th Cir. 2020), in which it determined that the U.S.

EPA had violated the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA)

in issuing the Dicamba Herbicide registration for the Dicamba Herbicides to the
Defendants.

33.  Among other holdings, the Ninth Circuit concluded that EPA violated
FIFRA by substantially underestimating several important risks and costs,
including the amount of Dicamba sprayed, the number of injury reports, and the
amount and costs of crop damage from spraying. That Court found that EPA
completely failed to consider and account for several other costs, such as economic
losses ensuing from anti-competitive effects of the registrations, as well as the
social costs of strife and dissension in farming communities triggered by rampant
off-target dicamba damage to neighbors' crops. Finally, it also held that EPA
violated FIFRA by predicating its conclusion that its approval would have no
adverse economic and environmental effects on label mitigation—in the form of
weather-related label use restrictions—that substantial record evidence
demonstrated were so extreme that farmers could not both follow them and have
any hope of controlling weeds. EPA failed to consider and analyze whether
following those directions was possible in real world farming conditions. 960 F.3d
at 1144.

34.  In light of the substantial flaws in EPA's decision, the Ninth Circuit
vacated the registrations. Id. at 1145.

35. On May 24, 2021, the EPA's Office of Inspector General issued a report of an investigation into EPA's 2018 decision to extend registrations for three dicamba pesticide products varied from typical operating procedures. The Inspector General found the following defects in the registration process and review: (i) the EPA did not conduct the required internal peer reviews of scientific documents created to support the dicamba decision; (ii) while division-level management review is part of the typical operating procedure, senior leaders in the OCSPP's immediate office were more involved in the dicamba decision than in other pesticide registration decisions, indicating political influence in the decision; (iii) senior-level changes were made to or omissions from scientific documents, including exclusion of some conclusions initially assessed by staff scientists to address stakeholder risks; (iv) staff felt constrained or muted in sharing their concerns on the dicamba registrations; and (v) the EPA's actions on the dicamba registrations  substantially understated some risks and failed to acknowledge others entirely.

36. The Defendants again applied for new registrations on July 2, 2020, just weeks after the Ninth Circuit's decision. EPA then approved those registrations on October 27, 2020, just days before the presidential election. That registration is being challenged in pending litigation in the U.S. District Court in Arizona.

37.  Contrary to the material misrepresentations of the Defendants to EPA, to purchasers of the Dicamba Herbicides, and to the public in its advertisements regarding the Dicamba Herbicides ability and propensity to drift and volatilize, the vast majority of scientific opinion that it is impossible to control the characteristics of Dicamba Herbicides to drift while and after being applied, and to volatilization after application, resulting in the widespread drifting and volatilization of the herbicides to adjoining fields and undeveloped areas, and damage or eradication of many wild and domestic plants from which Plaintiff's bees derive their sources of pollen and nectar.

38.  Notwithstanding the representations of the Defendants that their Herbicides would not drift or volatilize; and *notwithstanding* the restrictions and limitations placed upon the use of the dicamba-based herbicides by the EPA and the Arkansas Plant Board; and notwithstanding compliance with such restrictions by the farmers, applicators and other persons using the Dicamba Herbicides, those Dicamba Herbicides drift while being applied by farmers and other applicators, and volatilize after application, resulting in damage to or destruction of plants, crops and flowers in adjoining fields and undeveloped areas, some of which were at substantial distances from the fields where the Herbicide application occurred, and from which bees derive their sources of pollen and nectar.

39. As a result of the extensive use of the Herbicides in the Plaintiff's areas of operation in east Arkansas, and the resulting drift and volatilization of the Herbicides from the intended area of application to adjoining areas, many plants in east Arkansas (other than those crops from genetically-modified seeds) have been damaged or decimated. The continued use of the Dicamba Herbicides in eastern Arkansas will continue to cause widespread destruction and decimation of plant life in the area.

40. The potential of Dicamba Herbicides to drift and volalitize has been long recognized in plant science. This potential was also recognized by the restrictions placed upon the use of the Herbicides by the EPA in its regulatory approvals for the Herbicides, and the additional restrictions placed on its use and application by the Arkansas Plant Board, none of which were sufficient to prevent the drift or volatilization of the Dicamba Herbicides. Thus, the fact that Herbicides have, in actual use, drifted and volatilized was foreseeable on the part of the Defendants, and was, in fact, predicted by many respected weed scientists prior to their approval and introduction to the market.

41. The Defendants were aware of the likelihood of drift and volatilization to occur at the time of their application to the U.S. EPA for approval, and the sale of the Dicamba Herbicides to the farmers and applicators who were the ultimate end-users of the products. However, Defendants failed to adequately inform the

EPA, the farmers and other end-users of the likelihood of drift and volatilization, and failed to properly instruct them in use of the Dicamba Herbicides to prevent or reduce such likelihood.

42. As a result of the foreseeable drift and volatilization of the Herbicides to fields, undeveloped areas, gardens and other vegetated areas not intended for the application of the Herbicides, and the damage to or decimation of those vegetated areas, Plaintiff's bees were, in and after 2018, unable to obtain the nectar and pollen necessary for continued production of honey, and the Plaintiff sustained and continues to sustain a loss of sales of honey.

43. Further, as a result of the foreseeable drift and volatilization of the Dicamba Herbicides to fields, undeveloped areas, gardens and other vegetated areas not intended for the application of the Herbicides, Plaintiff's bees were, in and after 2018, unable to obtain the nectar and pollen necessary for their continued nourishment and life-support, and the Plaintiff has also sustained and continues to sustain a loss of bees.

44. In addition, because the Dicamba Herbicides volatilize and spread in all directions, it is difficult, if not impossible, to trace the field or place to which the Dicamba Herbicide was originally applied, and therefore to determine who was the owner/applier of the Herbicide.

45.  Because of the aggressive and misleading promotion of Defendants'
Dicamba Herbicide products; the extensive use of such products by farmers and
applicators in east Arkansas; and the characteristics of the Herbicides to volatilize
over large areas without leaving a "trace," it is difficult or impossible to identify
any single application that caused or contributed to the damage to plant life in that
area which caused Plaintiff's damages. Because each Defendant was aware of the
characteristics of the Dicamba Herbicides to drift and volatilize, and nevertheless
concealed, minimized or failed to adequately warn purchasers of those products of
those characteristics, each Defendant should be held liable for all damages claimed
herein in proportion to the sales of their products for use in the areas.

## PLAINTIFFS' CLAIMS FOR RELIEF

### COUNT I
### Violation of Lanham Act
### (15 U.S.C. § 1125(a)(l)(B))

46.    Plaintiffs incorporate by reference all of the above paragraphs as
though fully set forth herein.

47.  The Lanham Act, 15 U.S.C. § l 125(a), provides in pertinent part:

> (1)  Any person who, on or in connection with any goods or
> services, or any container for goods, uses in commerce any
> word, term, name, symbol, or device, or any combination
> thereof, or any false designation of origin, false or
> misleading description of fact, or false or misleading

representation of fact, which-

...

(B) in commercial advertising or promotion,
misrepresents the nature, characteristics,
qualities, or geographic origin of his or her or
another person's goods, services, or commercial
activities, shall be liable in a civil action by any
person who believes that he or she is or is likely
to be damaged by such act.

48.  Defendants' statements and commentary made to the press,
statements on the internet, during quarterly conference calls, incorporated into
Defendants' websites on its Herbicide product labels and marketing materials,
and through other media representing that the Dicamba Herbicides could be
safely used for over-the-top application on dicamba-resistant seeds and crops,
and would not drift and volatilize, were materially false statements that
promoted and misrepresented the nature, characteristics, and qualities of
Defendants' Herbicides.

49.  Those statements are materially false as they misrepresented, and
are, and continue to be, misrepresentations and denials of the nature, characteristics,
and qualities of the potential of the Dicamba Herbicides to drift and volatilize
onto non-target dicamba-intolerant crops and plants, and their ability to cause
damage to non-target dicamba-intolerant crops and plants as a result of over-
the-top dicamba application.

50.  Defendants' misrepresentations were widely distributed in the Nation's agriculture communities, and those misrepresentations influenced purchasing decisions of farmers, applicators and other end users of Defendants' Herbicide products.

51.  Defendants' misrepresentations proximately caused and continue to cause damage to Plaintiff as stated above.

52.  Defendants' acts constitute the use of false descriptions and false representations in interstate commerce in violation of the Lanham Act, 15 U.S.C. § 1125(a).

53.  Such misrepresentations and false descriptions by the Defendants of the nature, characteristics, and qualities of their Dicamba Herbicides  are a proximate cause of the Plaintiff's loss of honey production and loss of bees, which resulted in Plaintiff's loss of income from its honey business.


## COUNT II

### BREACH OF DUTY OF MANUFACTURER
### Ark. Code Ann. §16-226-101 et seq.

54.  Plaintiff ratifies and reaffirms all allegations heretofore set forth.

55.  The Defendants, as manufacturers of the Dicamba Herbicides, had a duty to use ordinary care in the selection of the materials used in the Dicamba

Herbicides, and to test it and to package it in order to protect those who would use it or who are in the area of its use from unreasonable risk of harm while it is being used for its intended purpose or while it is being used for any purpose which should reasonably be expected by the manufacturer.

56. The Defendants selected the chemical compound known as Dicamba as the principal active ingredient of the Herbicides, which, from earlier research, was known to have the characteristics of being highly prone to drift and volatilization.

57. The manufacturing and sale by the Defendants of the Dicamba Herbicides known to have the characteristics of drift and volatilization subjected the Plaintiff's bee operations to unreasonable risk of harm while the Dicamba Herbicides were being used for their intended purpose or while they were being used for any purpose which should reasonably have been expected by the Defendants.

58.    The manufacturing and sale by the Defendants of the Dicamba Herbicides known to have the characteristics of drift and volatilization were a proximate cause of the Plaintiff's loss of honey production and loss of bees, which resulted in Plaintiff's loss of income from its honey business.

59. The manufacturing and sale by the Defendants of the Dicamba Herbicides known to have the characteristics of drift and volatilization were a proximate cause of the Plaintiff's loss of bees, which resulted in Plaintiff's loss of income from its honey business.

60. Plaintiff should be granted judgment of and from the Defendants, jointly and severally, for its loss of income and loss of bees sustained since 2017 to the date of judgment and any reasonably foreseeable losses in the future.

## COUNT III

## BREACH OF DUTY OF MANUFACTURER TO WARN
## Ark. Code Ann. §16-226-101 et seq.

61. Plaintiff ratifies and reaffirms all allegations heretofore set forth.

62. The Defendants, as manufacturers of the Dicamba Herbicides, had a duty to give a reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of the Herbicides for a purpose and in a manner that the manufacturers should reasonably foresee.

63. The Defendants selected the chemical compound known as Dicamba as the principal active ingredient of the Herbicides, which, from its use in previously-manufactured and used herbicides, was known to have the characteristics of being prone to drift and volatilization.

24

64. In and as part of the sale by the Defendants of the Dicamba Herbicides known to have characteristics of drift and volatilization to farmers, applicators and other end-users of the Herbicides, the Defendants failed to give a reasonable and adequate warning of the drift and volatilization dangers inherent or reasonably foreseeable in the use of the Herbicides for the purpose and in a manner that the manufacturers should reasonably foresee.

65. The failure of the Defendants to warn persons who would be using and applying the Herbicides in the fields over the top of soybeans, corn and cotton subjected the Plaintiff's bee operations to unreasonable risk of harm while the Herbicides were being used for their intended purpose and while they were being used for any purpose which should reasonably have been expected by the Defendants.

66. The Defendants' failure to give a reasonable and adequate warning of dangers inherent or reasonably foreseeable concerning the Herbicides' characteristics of drift and volatilization were a proximate cause of the Plaintiff's loss of honey production and loss of bees, which resulted in Plaintiff's loss of income from its honey business.

67. Plaintiff should be granted judgment of and from the Defendants, jointly and severally, for its loss of income and loss of bees sustained since 2018 to the date of judgment and any reasonably foreseeable losses in the future.

## COUNT IV

## BREACH OF DUTY OF MANUFACTURER TO INSTRUCT
### Ark. Code Ann. §16-226-101 *et seq.*

68. Plaintiff ratifies and reaffirms all allegations heretofore set forth.

69. The Defendants, as manufacturers of the Herbicides, had a duty to give reasonable and adequate instructions with regard to the conditions and methods of its safe use when danger is reasonably foreseeable in its use.

70. The Defendants selected the chemical compound known as Dicamba as the principal component of the Dicamba Herbicides, which, from scientific research and its use in previously-manufactured and used herbicides, was known to have the characteristics of drift and volatilization.

71. In and as part of the sale by the Defendants of the Herbicides known to have the characteristics of drift and volatilization to farmers, applicators and other end-users of the Herbicides, the Defendants failed to give reasonable and adequate warning instructions to farmers, applicators and other end-users of the Herbicides of the drift and volatilization dangers inherent or reasonably foreseeable in the use of the Herbicides for the purpose and in a manner that the manufacturers should reasonably foresee.

72. The failure of the Defendants to instruct persons who would be using and applying the Dicamba Herbicides in the fields over the top of soybeans, corn and cotton regarding the characteristic of the Herbicides to drift and volatilize

26

subjected the Plaintiff's bee operations to unreasonable risk of harm while the

Herbicides were being used for their intended purpose or while they were being

used for any purpose which should reasonably have been expected by the

Defendants.

73. The Defendants' failure to give a reasonable and adequate instruction to

persons who would be using and applying the Herbicides of the Herbicides'

characteristics of drift and volatilization were a proximate cause of the Plaintiff's

loss of honey production and loss of bees, which resulted in Plaintiff's loss of

income from its honey business.

74. Plaintiff should be granted judgment of and from the Defendants, jointly

and severally, for its loss of income and loss of bees sustained since 2018 to the

date of judgment and any reasonably foreseeable losses in the future.

## COUNT V
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

75. Plaintiff realleges all proceeding paragraphs as if incorporated

herein.

76. Defendants sold the Dicamba Herbicides in the ordinary course of their

business, and said Herbicides were purchased by farmers for use in treating their

crops and property to prevent or eradicate weeds while not harming their crops or

property of other persons in the area in which the dicamba Herbicides were applied.

77. The Herbicides were not fit for their ordinary purposes. Specifically, the Dicamba Herbicides could not be used in the ordinary course of farming without migrating to the property of other persons through draft or volatilization.

78. Defendants were aware before any such Dicamba Herbicides were sold, and during the entire course of time in which the Herbicides have been on the market and being sold that their Dicamba Herbicide products were not fit for use in application over the top of crops for killing weeds without the likelihood of substantial harm being inflicted upon crops and other plant life in nearby areas. As a direct result of Defendants' Herbicides being unfit for the purposes for which they were sold, Plaintiff was damaged as described above.

## COUNT VI
### Nuisance

79. Plaintiffs incorporate by reference all of the above paragraphs as though fully set forth herein.

80. Defendants have created a nuisance to the Plaintiff by developing and selling Herbicides to farmers and other applicators of Herbicides that were and are prone to drift and volatilize when sprayed over-the-top of soybeans, cotton, corn and other crops, thereby causing widespread damage to non-dicamba resistant plants that such Herbicides have affected by drift or volatilization.

28

81. This constitutes an unreasonable and substantial interference with the rights of the Plaintiff to keep and maintain its bees and their honey-producing activities on lands not targeted by Defendants' Dicamba Herbicides.

82. Plaintiff has suffered harm from the nuisance caused by Defendants' Herbicides that is distinct and different from that suffered by the general public in that, as described above, they have suffered losses in the form of loss of profits from their honey-producing business and loss of bees from the damage and destruction of non-target crops and plants caused by the Herbicides.

## COUNT VII
### Trespass

83. Plaintiff incorporates by reference all of the above paragraphs as though fully set forth herein.

84. Plaintiff is engaged in the keeping and maintenance of bees and the sale of honey produced by those bees. The production of such honey is conducted by the bees in hives located on lands on which Plaintiff has permission or license from the owners thereof to use for such purposes.

85. Defendants, by manufacturing and selling the Herbicides that drift, volatilize and otherwise cause damage to non-dicamba-resistant plants have caused such Herbicides to enter upon property on which Plaintiff was legally

entitled to keep and maintain its bees, and on which such bees had a right to gather nectar, pollen and other plant substances. Such trespass by Defendants' Herbicides has adversely impacted Plaintiff's business through reduction in the harvest and yield of honey.

## COUNT VIII
### Negligence

86. Plaintiffs incorporate by reference all of the above paragraphs as though fully set forth herein.

87. Defendants owed a duty of reasonable care to its customers, the farmers and applicators who use the Dicamba Herbicides, and to other persons who, with reasonable foreseeability, might be affected by the Herbicides (such as adjoining property owners and Plaintiff) in developing, manufacturing and selling products that would meet the purposes and need for which they were sold and purchased, without risk of harm to the property of others, and would perform as represented.

88. Defendants manufactured and sold their products without taking ordinary care to avoid the foreseeable consequences of dicamba application, including volatilization and drift to areas other than that to which the Herbicides were applied.

89.  Defendants were negligent by acts and omissions including but not limited to:

a.  Manufacturing and selling a Dicamba Herbicide that Defendants knew or should have known would damage or decimate all plants other than those that had been genetically-engineered to resist the Herbicide and that was known to and would be likely to drift and/or volatilize to areas other than the target area for its application;

b.  Manufacturing and selling the Herbicides without reasonable, customary and adequate field testing by objective independent scientists, agencies or institutions to determine the potential of the Herbicides to drift or volatilize in real-world conditions.

c.  Manufacturing and selling the Herbicides without reasonable or adequate warnings and safeguards as to their use and the consequences thereof;

d.  Selling the Herbicides to farmers and other applicators with knowledge by Defendants that they lacked the mechanisms, experience, ability and /or competence to effectively prevent them from utilizing the Herbicides for over-the-top applications;

e.  Utilizing inadequate and difficult, if not impossible to follow labels and instructions;

f.  Failing to adequately warn and instruct farmers on the dangers of utilizing the Herbicides to the property of nearby property owners;

g.  In failing to test their products, including allowing independent testing by universities, state agencies and other testing organizations, to determine the extent to which over-the-top application of the Herbicides would injure off-target crops;

h.  In failing to provide reasonable instructions and take other appropriate measures as are necessary to prevent such non-target damage;

i.  In failing to give reasonable and adequate warnings of dangers inherent or reasonably foreseeable in the use of their products; and

j.  In failing to provide clear and understandable instructions to farmers, applicators and other end-users as are necessary to permit the reasonably safe use of their products.

90.  Defendants' negligence is a direct and proximate cause of the damages sustained by the Plaintiffs.

## COUNT IX
### Strict Liability - Products Liability
### (Ark. Code § 4-86-102 and § 16-116-101 et seq)

91.  Plaintiffs incorporate by reference all of the above paragraphs as though fully set forth herein.

92.  Pursuant to Section 4-86-102 and Section 16-116-101 *et seq* of the Arkansas Code, a supplier of a product is subject to liability for harm to another person or his property if: (1) the supplier is engaged in the business of manufacturing, selling, or distributing the product; (2) the product was supplied by him in a defective condition that rendered it unreasonably dangerous; and (3) the defective condition was a proximate cause of the harm to person or to property.

93.  Defendants are engaged in the business of manufacturing, selling, and distributing Dicamba-based Herbicide formulations to be utilized over-the-top of Defendants' genetically-engineered soybeans, cotton and corn, and therefore are each a "supplier" for the purpose of Section 4-86-102 of the

Arkansas Code.

94. Defendants' Herbicide formulations are defective products that, because of their characteristics of drift and volatilization, are uncontrollable and cannot be used in a safe manner to prevent injury to non-target crops. Each of the Defendants supplied their respective products in a defective condition that rendered them unreasonably dangerous to non-genetically engineered plants, flowers, bushes and trees.

95. The damage to non-genetically engineered plants, flowers, bushes and trees from the reasonably-foreseeable use and effect of the Herbicides was a direct and proximate result of such use, and the defective condition of Defendants' products was a proximate cause of the harm to Plaintiff.

96. Defendants are strictly liable for all damages to Plaintiffs and the Class caused by their products.

## COUNT X
## Strict Liability - Ultrahazardous or Abnormally Dangerous Activity
## (Arkansas Common Law)

97. Plaintiffs incorporate by reference all of the above paragraphs as though fully set forth herein.

98. Defendants' manufacturing, selling or otherwise disseminating the Dicamba Herbicide products that are highly toxic to plants that are not

33

genetically-engineered to withstand Dicamba, with full knowledge of those Herbicides' characteristics of drift and volatilization to areas other than that of application constitutes an abnormally dangerous or ultrahazardous activity because such activities involve a high degree of risk of harm to the valuable property of others that is significant, and that cannot be eliminated by the exercise of reasonable care.

99. The type of harm suffered by Plaintiff is the kind of harm, or the possibility of such harm, which makes the activity abnormally dangerous.

**COUNT XI**
**Arkansas Deceptive Trade Practices Act**
**(Ark. Code§ 4-88-101, et seq.)**

100. Plaintiffs incorporate all of the above paragraphs as though fully set forth herein.

101. Each of the Defendants is a "person" for the purposes of the Arkansas Deceptive Trade Practices Act pursuant to Ark. Code Ann.§ 4-88-102(3).

102. The Herbicide products constitute "goods" within the meaning of Ark. Code Ann.§ 4-88-102(6).

103. Pursuant to Arkansas Code Annotated section 4-88-108, it is unlawful for any person to conceal, suppress, or omit material facts in

connection with the sale or advertisement of goods, such as the Herbicides.

104.   Pursuant to Arkansas Code Annotated section 4-88-107(a)(1), it is unlawful for any person to knowingly make false representations as to the characteristics of goods, such as the Herbicides.

105.   Pursuant to Ark. Code Ann. section 4-88-107(a)(10), it is unlawful in Arkansas to engage in an "unconscionable, false, or deceptive act or practice in business, commerce, or trade." Further, pursuant to Arkansas Code Annotated section 4-88-107(b), "[t]he deceptive and unconscionable trade practices listed in this section are in addition to and do not limit the types of unfair trade practices actionable at common law or under other statutes of this state."

106.   Defendants engaged in unconscionable, false, and deceptive acts and practices in marketing, selling, and labeling their products to imply that the product could safely be used and not lead to damage to non-target crops and plants. Defendants knew or should have known, if exercising ordinary care, that this was not the case. Defendants were forewarned of the propensity of dicamba-based herbicides to drift and volatilize. Defendants also knew or should have known that the use of the products as labeled posed a risk to non-target crops and plants that was beyond the control of the user even when following the label or other instructions.

35

107.   Defendants' customers and Plaintiff were subjected to suppression, concealment and omission of material facts as a product of collusive, unlawful efforts by Defendants to suppress, conceal and omit from regulatory agencies, Defendants' customers and other users of the Herbicides that their products posed a risk to non-target crops and plants that was beyond the control of the user when following the label or other instructions.

108.   As a result of Defendants' concealment of such material facts, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the wrongful and unlawful conduct alleged in this complaint.

109.   Plaintiffs have a cause of action against each Defendant pursuant to Ark. Code Ann. Section 4-88-113 to recover their damages caused to their bees and the ability of those bees to produce honey, as well as reasonable attorneys ' fees.

110.   As a direct and proximate result of Defendants' ultrahazardous or abnormally dangerous activities, Plaintiff has sustained, and will continue to sustain substantial injuries and damages, including those alleged above.

111.   Defendants are strictly liable to Plaintiff for all damages that have resulted or will result from their abnormally dangerous activities with respect to disseminating the Herbicides.

## COUNT XII
## PUNITIVE DAMAGES

112.   Plaintiffs reallege all proceeding paragraphs as if incorporated herein.

113.   At all times, Defendants sold their Herbicides with full knowledge of the defective condition and danger of those Herbicides caused by the characteristics of drift and volatilization to non-dicamba resistant plants.

114.   The actions of Defendants in manufacturing and marketing the Herbicides with knowledge of the characteristics of drift and volatilization show complete indifference to or conscious disregard for the property of others, such as that of the Plaintiff, and was reckless, intentional, knowing, malicious, and willful. Plaintiff is entitled to a recovery of punitive damages against Defendants in a fair and reasonable amount.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully prays that this Court enter judgment against Defendants for (1) an award of such compensatory damages in an amount exceeding $75,000.00, (2) punitive damages in such amount as to punish the Defendants for their willful and reckless conduct; (3) entry of a preliminary and permanent injunction prohibiting Defendants from manufacturing, marketing, selling or distributing their Herbicide products in their current formulations; (4)

prejudgment interest; (5) awarding Plaintiffs their costs, expenses, and reasonable attorney's fees incurred in this matter; and (6) for such further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs request a jury trial on all issues so triable.

Dated: May 25, 2021.                        Respectfully submitted,

Richard H. Mays
Ark Bar No. 61043
**RICHARD MAYS LAW FIRM PLLC**
2225 Cottondale Lane – Suite 100
Little Rock, AR 72202
Telephone: 501-891-6116
Email: rmays@richmayslaw.com

38

## VERIFICATION

**STATE OF MISSISSIPPI**          )
                                  )ss.
**COUNTY OF STONE**               )

I, Richard Coy, after being duly sworn to tell the truth, state that I am a Vice-President of Coy's Honey Farm, Inc., an Arkansas corporation, and am duly authorized to sign this Verification on behalf of said corporation. I have read the above and foregoing Complaint, and the facts and allegations contained therein are true and correct to the best of my knowledge, information and belief.

**WITNESS MY HAND** as Vice-President of Coy's Honey Farm, Inc., on this 21 day of May, 2021.

_____
Richard Coy
Vice-President
Coy's Honey Farm, Inc.

**SUBSCRIBED AND SWORN TO** before me, a Notary Public in and for the State and County aforesaid, on this 21 day of May, 2021.

_____
Notary Public

2